C. H. STUART, INC., a New York corporation, d/b/a Sarah Coventry, Appellant,

v.

Charles H. "Ben" BENNETT and Diane Bennett, Appellees.

No. 52379.

Supreme Court of Oklahoma.

Sept. 23, 1980.

McAfee, Taft by John N. Hermes, Oklahoma City, for appellant.

Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick, Oklahoma City, for appellees.

LAVENDER, Chief Justice:

This is an appeal by C. H. Stuart, Inc. ("Sarah Coventry"), from an order of the District Court of Oklahoma County dismissing its cause. Sarah Coventry sought damages and an injunction against Ben and

Diane Bennett for breach of an employment contract. The district court found that Sarah Coventry had engaged in business in Oklahoma without domesticating or filing a trade name report, and was therefore foreclosed from suing in Oklahoma courts by our corporations statutes, 18 O.S. 1971, §§ 1.201(a), 1.11b.

## I

C. H. Stuart, Inc. is engaged in the business of selling costume jewelry nationwide under the trade name "Sarah Coventry." The company uses a network of employees who reside in the states and solicit other state residents to hold "fashion shows" to which they invite acquaintances and at which the employees solicit orders for jewelry. A Sarah Coventry employee attends each party to demonstrate the jewelry from a demonstration kit, owned by Sarah Coventry, containing samples of its products.

By normal operating procedure, all orders solicited at the party are forwarded to Sarah Coventry's New York office, where the order is either accepted and filled or rejected. The condition that all orders are subject to acceptance in New York is printed on the face of all order blanks filled in by customers.

The testimony below was that the Bennetts and others, with the permission of their superiors, made sales directly from the jewelry stock in their demonstration kit to Oklahoma residents and instructed their employees under them to do likewise. These sales occurred up to four times annually, especially at the time just prior to Christmas, and apparently on a regular basis. The Bennetts would replenish the stock in the kit by ordering directly from Sarah Coventry and having the replacement jewelry sent directly to them.

Sarah Coventry's employees in a state are organized in a heirarchy of four levels: Area Manager, Region Manager (the Bennetts' former position), Branch Manager, and Unit Director. Fashion show directors and party hostesses are characterized as independent contractors. All employees must complete employment contracts prior to employment. These contracts are completed by the prospective employee in his home state and are subject to acceptance only at the home office in New York. The contracts contain provisions whereby the employee agrees that upon termination of his employment, he will not for two years use or disclose any customer or salespeople/employee lists or solicit any of the salespeople or employees to leave Sarah Coventry's employ.

After a four–year period of employment, the Bennetts quit and began working for a competitor. Sarah Coventry alleged that the Bennetts breached their employment contracts by recruiting other Oklahoma employees of Sarah Coventry prior to the end of the two–year period. Each of the Bennetts was sued for $50,000 in damages, and Sarah Coventry sought a temporary restraining order against further solicitation.

The district court issued the temporary restraining order. After an evidentiary hearing, however, the court sustained the Bennetts' motion to dismiss. The court found that certain activities of Sarah Coventry constituted conducting business within the State of Oklahoma within the meaning of 18 O.S.1971, §§ 1.201(a)[1] and 1.11b.[2]

1. Section 1.201(a) provides:
   Any foreign corporation which has engaged in or transacted, or is engaging in or transacting, business within this State, either before it shall have become domesticated or after its certificate of domestication has been cancelled or revoked, shall not be permitted to maintain any action, brought by itself or its successor or assignee, in any court of this State until a certificate of domestication, or another such certificate, as the case may be, has been issued to such corporation. The failure, however, of such corporation to be-come domesticated before engaging in or transacting business in this State shall not impair the validity of any contract or act of such corporation and shall not prevent it from defending any action in any court of this State.

2. Section 1.11b provides the sanction for failure to comply with section 1.11a. Section 1.11a provides:
   A corporation doing business in this State under any name other than that of the corporation shall file a report with the Secretary of

We agree that Sarah Coventry has engaged in business within Oklahoma as contemplated by the statutes, and hold that the cause was properly dismissed.

## II

█ Sarah Coventry first contends that a foreign corporation engaged in strictly interstate commerce within the state is not required to comply with Oklahoma's domestication and trade–name registration statute. We agree with this contention. Any corporation engaged in strictly *inter*state sales and no *intra*state sales to Oklahoma residents may bring suit in Oklahoma courts without complying with Oklahoma's domestication and trade–name registration statutes, since interstate commerce is protected by the Commerce Clause of the United States Constitution.[3] Sarah Coventry asserts that it is engaged solely in interstate sales to Oklahoma residents.

However, the Bennetts urged and the district court found that Sarah Coventry's activities also included sales of a wholly intrastate nature. The most important of the activities urged to be intrastate sales was the practice of the Bennetts and other employees of making sales directly from the demonstration kits. These kits were supplied by Sarah Coventry to employees for the purpose of showing samples of its prod-

ucts to potential customers. Testimony disclosed that the Bennetts, at the direction of their supervisor, made sales up to four times each year directly from the sales kits to customers, in contravention to the stated company policy of making sales only by use of an order blank, filled in by the customer, that was subject to acceptance by the company in New York. All parties agree that the latter type of sales are interstate in nature and that conducting such sales would not subject Sarah Coventry to the Oklahoma statutes requiring registration.

The district court relied for its definition of what constitutes engaging in business for purposes of the Oklahoma registration statutes on a Tenth Circuit Case, *Wilson v. Williams.*[4] In that case the United States Court of Appeals interpreted 18 O.S.1971 § 1.201 and found that it did not apply to the activity in issue, drilling a single oil well. The court said that engaging in business in Oklahoma consisted of "the doing or performing of a series of acts which require time, attention, and labor, for the purpose of livelihood, profits, or pleasure; and the doing of a single act of business in the state does not constitute the doing of business ...."[5] This test was first articulated in an early Oklahoma case, *Fuller v. Allen.*[6]

Sarah Coventry contends that its method of doing business qualifies its sales as strict-

State setting forth the trade name under which such business is carried on, a brief description of the kind of business transacted under such name, the address wherein such business is to be carried on, the corporate name and the name and address of its registered agent in this State.
Section 1.11b provides:
   Any domestic or foreign corporation which has engaged in or transacted, or is engaging in or transacting, business within this State under any name other than that of the corporation without filing the report required by [section 1.11a] above, shall not be permitted to maintain any action in any court of this State until such report has been filed. Any court of this State having equity jurisdiction may, upon petition being filed against such corporation by the Attorney General, or by any person, association or corporation interested or affected, enjoin the defendant corporation from doing business under that name until it complies with [section 1.11a].
No decision of this Court has construed sections 1.11a and 1.11b. The sections are almost identical in wording to section 1.201(a) and provide an identical sanction (inability to bring suit in Oklahoma courts) for failure to comply with an identical requirement (registration with the Secretary of State). Therefore, our finding of what constitutes doing business in Oklahoma will apply identically to all three sections.

3.  *Eli Lilly & Co. v. Sav -On- Drugs, Inc.,* 366 U.S. 276, 278 -79, 81 S.Ct. 1316, 1318, 6 L.Ed.2d 288, 291–92 (1961).

4.  222 F.2d 692 (10th Cir.1955).

5.  *Id.* at 697.

6.  46 Okl. 417, 148 P. 1008, 1008 (1915) (syllabus ' 1). Insofar as it applied to minimum contacts for amenability of a foreign corporation to suit by a resident, *Fuller v. Allen* was overruled by *B. K. Sweeney Co. v. Colorado Interstate Gas Co.,* 429 P.2d 759, 763 (Okl. 1967).

ly interstate commence because: (1) the purchase order is subject to final acceptance or approval outside the state in which it is given, (2) the order is filled by a shipment originating from a state other than that in which the purchaser is located, and (3) payment is made to an office of the seller located in a state other than that in which the purchaser is located. This Court has applied these considerations and the *Fuller* test when considering the nature of business in Oklahoma for purposes of the domestication statute.

A contract to sell machines to an Oklahoma purchaser by sending the machines into Oklahoma f. o. b. the seller's out–of–state place of business was held to be interstate sales and not conducting business within Oklahoma for purposes of the statute requiring domestication. *Fuller v. Allen.*[7]

Where an undomesticated foreign corporation had two agents in the state, one to make sales agreements and one to promote good will and make collections, the corporation's shipments to fill the orders solicited by the agent, shipped f. o. b. the seller's plant outside the state, were held not doing business within the state. *Sooner Beverage Co. v. G. Heileman Brewing Co.*[8] Similarly, simply appointing an agent to transact the company's business within the state was not doing business within the state. *Verdigris River Land Co. v. Stanfield.*[9]

Paying an Oklahoma resident to notarize a conditional sales contract and forward a used machine to a resident of a third state was held to be doing something merely incidental to an interstate transaction and not conducting business within the state. *Cugley Incubator Co. v. Franklin.*[10]

A corporation that maintained a branch office in Oklahoma from which its agent solicited orders to be accepted by the corporation in another state, and that shipped the goods from the other state into Oklahoma, was not required to register in Oklahoma in order to be able to bring suit since its activities were only interstate. *Fruit Dispatch Co. v. Wood.*[11]

However, a corporation's activities were held to constitute conducting business within the state and not interstate commerce where goods were shipped by the corporation to its agent, not in response to the order of a customer but to be held in stock and thereafter sold in Oklahoma. *Bailey v. Parry Mfg. Co.*[12] Similarly, a foreign corporation that owned merchandise stock and fixtures located in Oklahoma, under the charge of its agents in Oklahoma and kept for sale at retail in Oklahoma, was held to be doing business in Oklahoma sufficient to require its registration as a condition precedent to maintaining suit in the state. *Seidenbach's v. A. E. Little Co.*[13]

The decisions in these cases turned on the regularity of an admittedly intrastate transaction, whether the transaction was merely incidental to interstate commerce, or on the mechanics of the transaction itself. If merchandise is mailed from outside the state in response to an order from inside the state, the transaction is purely interstate, while direct sales to state residents from inventory in the state is conducting business within the state.

The evidence showed that sales of jewelry were made directly to Oklahoma customers from the demonstration kits provided by Sarah Coventry to the Bennetts and other employees, in addition to normal interstate sales by mail order. After such direct sales, the Bennetts then ordered jewelry from the company, which was sent directly to the Bennetts to replace the jewelry sold from the kit. These direct sales were made on a regular, recurring basis at various times of the year during the four years the Bennetts were employed by Sarah Coventry.

---

7.   148 P. at 1008 (syllabus ' 2).

8.   194 Okl. 252, 150 P.2d 72, 74 (1944).

9.   25 Okl. 265, 105 P. 337, 340 (1909).

10.   193 Okl. 202, 142 P.2d 125, 127 (1943).

11.   42 Okl. 79, 140 P. 1138, 1140 (1914).

12.   59 Okl. 152, 158 P. 581, 583 (1916).

13.   146 Okl. 247, 294 P. 126, 128 (1930).

Obviously, the sales from the demonstration kits were a "series of acts which require time, attention, and labor, for the purpose of ... profits ...." *Wilson v. Williams, supra.* Such sales also constituted conducting business within the state, since the sales were on a regular basis, and not an isolated transaction as in *Wilson.* The sales were not simply incidental to interstate transactions as in *Cugley Incubators* ; and Sarah Coventry's employees accepted the customers' orders entirely within Oklahoma and immediately filled the order from a stock maintained by the employee, held to be intrastate commerce in *Bailey.*

Sarah Coventry would not, simply by maintaining employees in the state to solicit orders and collect money, be doing business in the state. *Sooner Beverage Co. v. G. Heileman Brewing Co., supra.* Also, merely recruiting employees in Oklahoma is not conducting business within the state when the employment contracts are subject to acceptance in New York. *Verdigris River Land Co. v. Stanfield, supra.* As a matter of fact, Sarah Coventry has chosen a formal method of doing business that is wholly interstate and, if followed, would not be transacting business in Oklahoma. By its formal method, all contracts are subject to acceptance in New York. No office, warehouse, or inventory is kept in the state; no real property is owned or leased in the state; no products are advertised in the state and only recruitment advertisements are placed; no bank account is maintained in the state; and all jewelry is shipped into the state from the home office in New York.

However, whatever the formal policy of a company claiming to engage only in interstate commerce, the company's actions "speak more loudly than the legal terms used to describe relationships ... as appear in the wording in its contracts and forms." *Armor Bronze & Silver Co. v. Chittick.*[14] The *Armor Bronze* court said that between the instance of salesmen simply taking orders from customers, to be accepted out of state and then filled, and instances where a corporation's agents entered into contracts within the state, there lies "a myriad of fact situations not clearly in one class or the other, but which must be adjudged as engaging or not in the transaction of business in the state."[15]

Sarah Coventry's activities lie between the extremes noted in *Armor Bronze,* but the evidence was such that the trial court could have found that the company's agents were engaged in business in Oklahoma. These actions of the company's employees must be chargeable to the company as their principal.

Obviously, a corporation can function only through the actions of its agents and servants. A principal is bound by the acts of an agent on the principal's behalf when the agent is acting within the scope of his express, apparent, or implied authority, but in the absence of ratification of unauthorized acts or of estoppel, the principal is not bound by the acts of an agent made outside the scope of his authority.[16]

In this case, Mr. Bennett testified that he had been told by his area manager to make direct sales and deliveries from the demonstration kit. However, at least one other district manager in the Oklahoma City area testified that she had received no such instructions. This inconsistency presents two possibilities.

First, it could be the actual company policy to make such direct sales, notwithstanding the written policy as stated on employment contracts and order forms. In such a case Sarah Coventry would obviously be engaged in business in the state, since its employees would be making direct sales to Oklahoma residents with its express authority to do so. The company would then be compelled to meet the requirements of 18 O.S.1971 §§ 1.201(a) and 1.11b.

The second possibility is that Sarah Coventry did not actually authorize the sales by

---

**14.** 221 F.Supp. 505, 514 (D.Conn.1963).

**15.** *Id.* at 511.

**16.** 3 C.J.S. *Agency* § 391, at 220–23.

its employees directly from the demonstration kits, but that such sales were initiated by the Bennetts' area manager in Oklahoma in violation of company policy. In such a case, the principal is not bound by the act of an agent outside the limit of his authority.[17] The company policy was only to make interstate sales. There was no evidence of representations by the company to the Bennetts or other employees to create implied authority for the sales, and there was no evidence of representations to customers by the company to create apparent authority or agency by estoppel.[18]

█ If Sarah Coventry has been the victim of a disobedient servant and is totally innocent, it should not ordinarily be subjected to Oklahoma domestication and trade–name registration statutes. However, in this case, the company received and retained the benefits of its employees' sales, whether the sales were authorized or unauthorized. One who accepts the benefits of the unauthorized acts of his agent ratifies the acts and accepts all the burdens and benefits of the acts.[19] It is not essential to ratification that the principal have knowledge of the acts of the agent if the benefits from the acts are retained after the happening of such events as would place a reasonably prudent person on inquiry.[20]

█ In this case, normal sales resulted only in orders from customers. Since no direct sales by employees were allowed, when it received regular orders from its employees, Sarah Coventry was put on notice that its employees were making unauthorized sales. Failure to object to these sales and retention of the benefits from the sales were a ratification of the acts of the employees.

A certain percentage of the orders from the various states are rejected by the company at the New York office. Thus, it is obvious that the clerical employees who process orders do more than merely accept the orders mechanically. When these other agents of the company receive orders from the agents in the field, notice is imputed to the corporate entity, since the knowledge of an agent (clerical employee in this instance) obtained within the scope of his authority is ordinarily imputed to his principal.[21] Notice is imputed to the principal unless circumstances are such as to raise a clear presumption that the agent will not communicate his knowledge to the principal.[22] When Sarah Coventry receives the orders from field agents in the New York office, it then has notice that the agents are regularly making direct sales and must either correct the practice or be bound by the acts of the agents and accept the benefits and burdens thereof, including compliance with the domestication and trade–name registration statutes of Oklahoma.

The trial court had sufficient evidence from which it could find that Sarah Coventry received the benefits from the sales of its agents and failed to protest. The company was therefore required to follow Oklahoma's domestication and trade–name registration statutes, whether or not it directly authorized the direct sales by appellees and other employees, since it retained the benefits of such sales while in possession of information that should have placed it on inquiry. The district court correctly granted the appellees' motion to dismiss.

III

█ Sarah Coventry's second contention is that its right to maintain suit in Oklahoma courts is unaffected by the statute requiring domestication as a condition precedent to bring such suit. It relies primarily on two early cases, *Kibby v. Cubie, Hei-*

17. *Continental Supply Co. v. Sinclair Oil & Gas Co.*, 109 Okl. 178, 235 P. 471, 474 (1924).

18. See 2A C.J.S. *Agency* § 157, at 785–91.

19. *Holmes v. McKey*, 383 P.2d 655, 665 (Okl. 1962).

20. *Outboard Marine Center v. Little Glasses Corp.*, 338 P.2d 1101, 1104 (Okl.1959).

21. *Bailey v. Gulf Insurance Co.*, 389 F.2d 889, 891 (10th Cir. 1968).

22. *A. A. Murphy, Inc. v. Banfield*, 363 P.2d 942, 946 (Okl.1961).

mann & Co.[23] and *Verdigris River Land Co. v. Stanfield*.[24] The *Kibby* case relied on language from the *Verdigris River* case for its decision on the applicability of the statute requiring domestication as a condition precedent to bringing suit to enforce contracts with Oklahoma residents.

In *Verdigris River* the plaintiff sought to enforce a contract with its agent. The agent pled in bar the Indian Territory statute requiring domestication, alleging that the plaintiff was engaged in business within the state. The statute provided not only that contracts between undomesticated foreign corporations and residents of the state could not be enforced in the courts of the Territory, but also that such contracts were void as to the corporation.[25] The Court was concerned that fiduciaries of corporations would be able to breach their duties while within the Territory and then hide behind the law voiding the contract of the undomesticated corporation. The Court said the part of the statute voiding contracts between undomesticated corporations and citizens of the Territory did not apply to contracts between the corporation and its fiduciary agents.[26]

Oklahoma no longer has a provision in its law voiding the contracts of undomesticated foreign corporations. Quite the contrary, 18 O.S.1971 § 1.201(a) provides: "The failure, however, of such corporation to become domesticated before engaging in or transacting business in this State shall not impair the validity of any contract or act of such corporation . . . ." The language preceding this clause provides that a foreign corporation that engages in business within the state before it becomes domesticated shall not be allowed to "maintain *any* action . . . in *any* court of this State . . . ." This language shows no intent of the legislature to make any exception for contracts between corporations and their fiduciaries.

We think that Sarah Coventry's second contention is without merit.

**23.** 41 Okl. 116, 137 P. 352 (1913).

**24.** 25 Okl. 265, 105 P. 337 (1909).

The order of the district court is affirmed.

IRWIN, V. C. J., and WILLIAMS, HODGES, SIMMS, HARGRAVE and OPALA, JJ. concur.

DOOLIN, J., dissents.

**25.** Act of Feb. 18, 1901, ch. 379, § 5, 31 Stat. 795.

**26.** 105 P. at 339.